IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROBERT F. CHERRY, JR., et al.        *

               Plaintiffs        *

               vs.        *    CIVIL ACTION NO. MJG-10-1447

MAYOR AND CITY COUNCIL OF        *
BALTIMORE CITY, et al.
                              *

              Defendants
*        *        *        *        *        *        *        *        *

<u>THIRD TRIAL DECISION RE: REASONABLE AND NECESSARY</u>

The instant case presents claims by, and on behalf of, members and beneficiaries of the Fire and Police Employees' Retirement System of the City of Baltimore (the "Plan"). Plaintiffs contend that when the City of Baltimore (the "City") enacted Ordinance 10-306, effective June 30, 2010[1] (sometimes referred to herein as the "Ordinance"), it violated rights of the Plan members guaranteed by the Contract Clause of the United States Constitution.[2]

---

[1]    There may be a question as to whether the effective date of the Ordinance is June 30 or July 1, 2010.  Herein, the Court is referring to June 30, 2010, as the effective date without prejudice to the right of any party to contend that the effective date is July 1, 2010, in a context in which the matter may be material.

[2]    Plaintiffs have also asserted claims based upon state law against the City and other Defendants.  The Court is initially resolving the federal law claims against the City.  The Court will proceed regarding the state law claims as appropriate in light of the resolution of the federal law claims.

I.   <u>PROCEDURAL SETTING</u>

The Court has proceeded to resolve Plaintiffs' federal

Contract Clause claims in stages, conducting three bench trials.

Following the first trial, the Court issued the First Trial

Decision Re: Constitutional Claims [Document 68] ("First

Decision").  In the First Decision, the Court:

- Found that the Ordinance did not create vested
  contractual rights for Plaintiffs, cognizable for
  Contract Clause purposes ("Vested Constitutional
  Rights") upon the commencement of their employment.

- Found that Plaintiffs' Contract Clause Claim was based
  upon the elimination of the Variable Benefit by the
  Ordinance.

The Court then proceeded to the second trial to determine:

- Whether elimination of the Variable Benefit
  constituted a retroactive impairment of Vested
  Constitutional Rights of some, or all, of the
  Plaintiff Class.

- If so, whether such impairment substantially impaired
  Vested Constitutional Rights of Plaintiffs in the
  context of the Contract Clause.

Following the second trial, the Court issued the Second

Trial Decision Re: Substantial Impairment [Document 115]

("Second Decision").  In the Second Decision, the Court found

that the elimination of the Variable Benefit feature constituted

a substantial retroactive impairment of Vested Constitutional

Rights for some, but not all, members of the Plaintiff Class.

Specifically, the Court found the Plaintiff Class divisible into

2

three groups and found that:

- The Entitled Group – consisting of those members of the Plan who, as of the Ordinance effective date, were fully entitled to (and receiving) benefits under the Plan - had sustained a substantial retroactive impairment in the Contract Clause context of their right to the Variable Benefit feature.

- The Eligible Group - consisting of those members of the Plan who, as of the Ordinance effective date, were eligible to retire but were not entitled to receive benefits because they were continuing to work - had sustained a substantial retroactive impairment in the Contract Clause context of their right to the Variable Benefit feature with respect to benefits based upon service prior to the effective date of the Ordinance.

- The Pre-Eligible Group – consisting of those members of the Plan who, as of the Ordinance effective date, were working and not yet eligible to receive benefits – had not sustained a substantial retroactive impairment in the Contract Clause context of any right to the Variable Benefit feature.

The Court has conducted the third trial to determine whether the City's substantial impairment of the contractual rights of the Entitled and Eligible Groups was permissible because it was reasonable and necessary to serve an important public purpose.

The Court has heard evidence, reviewed the exhibits, considered the materials submitted by the parties, and has had the benefit of the arguments of counsel.  The Court has made its factual findings based upon its evaluation of the evidence and the reasonable inferences drawn therefrom.  The Court now issues this Third Trial Decision as its findings of fact and

conclusions of law in compliance with Rule 52(a) of the Federal

Rules of Civil Procedure.[3]


II.   BACKGROUND

     A.   The Plan and the Ordinance

     In 1962, Baltimore City enacted the Fire and Police

Employees' Retirement System of the City of Baltimore (the

"Plan") to provide defined benefits to its members and

beneficiaries.

     In 1983, the City amended the Plan to include a post-

retirement benefit enhancement feature, the Variable Benefit.[4]

The Variable Benefit provided an increase to the basic benefit

received by an eligible member or beneficiary[5] if "excess"

investment earnings were generated from Plan funds during a

fiscal year.

---

[3]    As noted previously by this Court in its May 25, 2011 order
[Document 101], because it did not participate in this trial,
the Board of Trustees of the Fire and Police Employees'
Retirement System (the "Board") is not bound by any finding of
fact or conclusion of law in this decision, should there be a
claim pursued against the Board.  [See also Document 165.]

[4]    The Variable Benefit was adopted largely because Plan
members were not enrolled in the federal Social Security system
and, therefore, did not receive cost of living increases to
offset inflation.  See GBC Report at 23.

[5]    A member who retired under the normal requirements set
forth in Article 22 was not immediately eligible for the
Variable Benefit.  Rather, a retired member only became eligible
for a Variable Benefit increase after two years of retirement.
Art. 22, § 36A(a)(1)(i) (Dec. 31, 2009).

In essence,[6] if the returns on investment of Plan funds attributable to the retirees for a fiscal year exceeded 7.5%, there were deemed to be "excess" investment earnings.[7]  The excess investment earnings were set aside for payment of Variable Benefit increases and were invested more conservatively than the general Plan funds.[8]  The amount of the Variable Benefit increase for a fiscal year was determined by a complex actuarial computation based on the prior year's excess investment earnings.  Stephan Fugate, Chairman of the Board of Trustees of the City's Fire & Police Employees' Retirement System (the "Board"), explained how the Variable Benefit worked:

> The Variable Benefit, the funds of the system, the assets in the Plan are essentially segregated into six separate accounts.  This is under the previous Variable Annuity structure. . . . The primary purpose of that was to be able to identify those assets attributable to the retired members and beneficiaries, and those assets attributable to the active members. The significance of that is that in the Variable Benefit calculation, it's only the excess interest return on the attributable to the retirees' side that's used in the calculation for the increase in benefit.

Trial Tr. Jan. 31, 2012 at 79.

---

[6]   A more precise explanation is presented in the Second Decision at pages 4-6.

[7]   The "excess" was 100% of earnings between 7.5 and 10% and one-half of any earnings above 10%.

[8]   The set-aside funds were the only source for the payment of Variable Benefit increases.

Over the years 1983 through 2010, the Variable Benefit
feature yielded approximately the same increase to Plan members'
pension benefits as an annual 3% increase would have produced.
The Ordinance, effective June 30, 2010, eliminated the Variable
Benefit feature from the Plan for future years.  The Ordinance
"substituted" an age-dependent post-retirement benefit Cost of
Living Adjustment (the "Tiered COLA").  Therefore, after June
30, 2010, in lieu of the Variable Benefit feature applicable
equally to all beneficiaries, the Ordinance differentiated
between beneficiaries, essentially based upon their age as
reflected in the following chart:

| Type Of Beneficiary | Number[9] In Category | Annual Increase |
|---|---|---|
| Under 40 years | 138 | 0% |
| 40 – 54 | 1,017 | 0% |
| 55 – 64 | 1,707 | 1% |
| 65 + | 3,145 | 2% |
| 100% Disability[10] | 5 | 2% |

The Ordinance provided for a minimum $16,000 per year
pension for widows or widowers of Plan members who, before
August 1, 1996, retired or died while in service with at least
20 years of service.

The Ordinance also took the funds - some $500 million -
dedicated for the payment of Variable Benefit increases - and

---

[9]    As of the year ended June 30, 2010.
[10]   This category refers to beneficiaries who became completely
disabled in the line of duty.

placed these in the general pension fund to reduce the City's
pension contributions.  In return, however, the City guaranteed
the payment of the accrued Variable Benefit increases for which
the funds had been set aside.


      B.   The Variable Benefit Contribution Increase

     Each year since 2008, the City faced budget deficits that
it was required to close for the next fiscal year.  Trial Tr.
Feb. 2, 2012 at 5-9.  The City adopted measures to close the
deficits, including a hiring freeze, a pay freeze, unpaid
furloughs, layoffs, deferral of infrastructure projects,
rotating firehouse closures, reducing trash pickup, and cutting
library hours.  Id.  However, unanticipated revenue shortfalls
and extraordinary snow-removal costs required additional budget
cuts.  Id. at 9-13.  All told, to balance the budget for fiscal
year 2010, the City made $120 million in spending cuts.  Id. at
10.

     As the City prepared to enter fiscal year 2011, which was
to begin on July 1, 2010, the projected deficit exceeded $100
million based on the then-anticipated pension contribution of
some $101 million.  Id. at 15.  The City passed tax increases to
raise revenues and to mitigate the need for additional cuts to
core services.  Id. at 16-18.

     As fiscal year 2011 approached, the Plan's actuary and its

Board recommended that the statutory post-retirement investment return assumption of the Plan be reduced from 6.8% to 5%.  See Memo from Edward Gallagher to City Council, June 8, 2010, at 7 (Legislative File).  Essentially, it had become clear that assuming 6.8% annual growth of the funds from which the Plan's Variable Benefit was calculated was unrealistic, whereas a 5% assumption would be more appropriate.  Making this change to the statutory assumption would require the City to make a greater annual contribution to the Plan to avoid underfunding it. Instead of the anticipated $101 million contribution to the Plan in fiscal year 2011, lowering the investment return assumption to 5% for the funds from which the Plan's Variable Benefit was calculated would require the City to contribute an additional $64 million to the Plan, for a total contribution of $164.9 million.  See id. at 2.

Put another way, the City would need to fund the basic pension plan in a way that accounted for the fact that the Variable Benefit structure would skim off most earnings above 7.5% in any good year.  Mr. Lowman explained why the City would be required to contribute an additional $64 million if it accepted that the 6.8% assumption should be lowered to 5%: "I think of the $64 million more as the average expected future cost every year that will be skimmed off the earnings for the Variable Benefit increases, but it's only an average."  Trial

8

Tr. Jan. 30, 2012 at 83.

Confronted by the need to find, by July 1, 2010, an additional $64 million to contribute to the Plan funds in an already challenging budget environment, the City determined that the Plan, particularly the Variable Benefit feature of the Plan, was unsustainably costly.  Trial Tr. Feb. 2, 2012 at 48.

      C.    The Path to the Ordinance

          1.    The GBC Report

In May, 2010, the Greater Baltimore Committee ("GBC"),[11] in response to a 2009 request from Mayor Stephanie Rawlings-Blake (then President of the City Council), issued a report proposing changes to the Plan.[12]  The GBC recommended, among other things,[13]

---

[11]    The GBC is a membership organization of more than 500 businesses, nonprofit organizations, and educational and civic institutions.  See http://www.gbc.org/.

[12]    The GBC had been called upon by the City to engage financial experts to evaluate the pension system and make recommendations.  Trial Tr. Feb. 2, 2012 at 21.

[13]    The GBC recommended: 1) combining the six pension plan funds into a single fund; 2) eliminating the Variable Benefit and introduction of a COLA benefit not to exceed 3% per year; 3) increasing employee contributions from the current rate of 6%; 4) requiring the City to commit to making the Annual Recommended Contribution calculated by the Plan's actuary each year (rather than sometimes satisfying its obligation to fund the Plan by using Plan excess earnings); 5) revising age and service requirements, setting the minimum age for full retirement at 55 years or 25 years of service; 6) eliminating the generous "DROP-2" deferred option retirement plan; 7) increasing the span of months in calculating the average final compensation of members; 8) enrolling new hires in a defined contribution plan and federal Social Security; and 9) restructuring Plan system

replacing the Variable Benefit feature with a cost of living benefit, not to exceed 3%.

The GBC report included a summary of changes recommended by the fire and police unions (the "Unions").  See GBC Report at 18.  The Unions had engaged an actuary, Tom Lowman of Bolton Partners, Inc., to evaluate the Plan.  The Unions' proposed reforms, as presented to the GBC, also included replacing the Variable Benefit with an annual cost of living benefit of 2% per year for all members, with provisions to increase it to 2.5% in future years based on the adequacy of Plan funds.  Id.  The GBC reviewed the Unions' proposal and concluded that, "although the proposals offered some changes to the system that most of the recommendations would likely increase costs to the City without addressing the driving costs of the plan."  Id.

        2.    The PFM Report

In April 2010, the City engaged Public Financial Management, Inc. ("PFM"), to evaluate "what changes, if any, are reasonable and necessary to safeguard the public welfare and the long-term sustainability of the system."  See PFM Report at 5. The PFM report built, in part, on the GBC report.  PFM produced a report on June 7, 2010, to accompany proposed legislation to the City Council - City Council Bill 10-0519.

---

governance.  See GBC Report.

The PFM report recommended and the proposed legislation provided that the City:

- **Replace the current "variable benefit"** for retired members of the plan with an annual increase based upon a cost of living adjustment with an annual cap;

- **Increase employee contributions** supporting the F&P system;

- **Lengthen the age and service requirements** for determining eligibility for pension benefits;

- **Revise the calculation method for average final compensation** . . . by increasing the service period used in the calculation.

PFM Report at 51 (emphasis in original).

By eliminating the Variable Benefit and consolidating the Plan funds, the proposal in the PFM report eliminated the need to reduce the statutory post-retirement investment return assumption on the funds from which the Plan's Variable Benefit was calculated from 6.8% to 5%.  The proposal also included reductions to other Plan interest rate assumptions.

The PFM report stated that it recommended eliminating the Variable Benefit feature because the feature had an illogical structure that allowed for "short-term windfalls to member benefits with no real connection to inflation."  PFM Report at 52.  The PFM report illustrated this "illogic" by pointing out that a partial market rebound in 2010 after the disastrous market losses of 2008-2009 could lead to a Variable Benefit

payout at a rate "well above consumer price growth based on
'excess investment earnings' – even though the underfunded
system overall will not have come close to regaining its losses
of the two prior years."  Id.

The PFM report proposed a Tiered COLA to replace the
Variable Benefit, rather than a uniform COLA: "This COLA would
be applicable only to retirees age 55 and older, and be set at
1% for retirees age 55-64, and at 2% for retirees age 65 and
older."  PFM Report at 52.  The PFM report noted that "this type
of approach would provide greater budget predictability, reduce
the volatility of increases for retirees, and conserve a greater
portion of pension assets in years of high earnings growth to
help ensure longer-term system sustainability."  Id.  The report
noted that many similar police and fire pension plans provide
post-retirement benefit increases by way of capped COLAs tied to
the consumer price index ("CPI"), calculated and published by
the United States Department of Labor Bureau of Labor
Statistics, which measures the inflation of consumer goods and
services.  See id.  However, the PFM report did not provide any
examples of other pension systems implementing a Tiered COLA as
was proposed for Baltimore.

### 3.    The Legislation

The proposed legislation was largely consistent with the recommendations in the PFM report.  The proposed legislation included a Tiered COLA as was recommended in the PFM report. According to the Mayor, the City "could not afford to do two percent for everyone."  Trial Tr. Feb. 2, 2012 at 48.  "[T]he drafters of the legislation set out to provide the greatest benefit for the retirees and beneficiaries who were likely to need it the most - the large number of retirees and beneficiaries who were 65 years of age and older and who were likely to depend principally on their pension for their income." City Post-Trial Br. [Document 155] at 5.  The Mayor testified:

> So the individuals up to age 55, many of them worked full-time and more than full-time, many of them.  And because of that, zero was chosen, because they are less vulnerable, most of them, they were made less vulnerable because of the, you know, inflation, because the pension is not their only source of income.
>
> And from there to 65 and over, it was a tiered approach to try to approximate when individuals would be more dependent on the pension for income.

Trial Tr. Feb. 2, 2012 at 110-11.

After the proposed legislation was introduced, the Unions submitted a counter proposal to the City Council, similar to the proposal that it had presented to the GBC.  This proposal included a 2% COLA for all retired beneficiaries.  See Union

13

Proposal at 6.  In addition, on June 8, the Plan's Board voted

to oppose the proposed legislation.  See Pls.' Ex. 66 at 2.

On June 9, the City Department of Law provided its opinion

that no contractual obligation existed with respect to the

Variable Benefit feature, and that the proposed legislation was

constitutional.  See DiPietro Letter June 9, 2010.

On June 10, three days after the proposed legislation was

introduced, the City Council's Taxation, Finance and Economic

Development Committee held a hearing on it.  The City's Director

of Finance, Edward Gallagher, introduced the City's panel that

testified in support of the bill, including representatives from

the PFM Group; Doug Rowe, the Plan's actuary; and William

Fornia, an actuary retained by the City from AON Consulting.

The Unions presented testimony from their leadership, members,

counsel, and actuary, Tom Lowman.  Consistently, the Unions'

witnesses stated that, under the circumstances, they were

willing to have the Variable Benefit eliminated but they wanted

a replacement COLA "that they can live with and their widows can

live with."  Tr. City Council June 10, 2010 at 61.

On June 21, 2010, the City Council voted on Bill 10-0519.

Councilwoman Clarke proposed a slate of amendments that were

drafted by the Unions.  On the subject of post-retirement

benefit increases in the proposed bill amendments, Clarke noted:

14

> [T]he retirees were getting an average of 3
> percent increase a year through variable
> benefits.  Some years they got none.  Some
> years they got more than three.  It averaged
> out to about 3 percent a year increase in
> their pensions.
>
> They gave up that variable benefit and asked
> for a 2 percent increase a year, which is in
> [Bill 10-0]519, but only for retirees 65 and
> older, and 1 percent for retirees 55 and
> older, and nothing, as much as our committee
> chairs tried, for a disabled firefighter,
> for example, who goes out young, on a 66 and
> two-third disability, he wouldn't or she
> wouldn't be eligible for any increase in the
> pension they get for disability serving us
> until they were 55 years old.  And so to
> overcome that, the Fire and Police Unions,
> the FOP and the unions have said 2 percent .
> . . everybody gets 2 percent all the way up
> the line of retirees.

Tr. City Council June 21, 2010 at 6-7.  Clarke's proposed

amendments failed to gain a majority of votes.  See id. at 12.

Thereafter, a majority of the City Council voted in favor of the

proposed legislation.  The Mayor signed the bill June 22, 2010,

thus enacting it into law as Ordinance 10-306.


III. LEGAL FRAMEWORK

     The Contract Clause, Article I, § 10 of the United States

Constitution provides: "No State shall . . . pass any . . . Law

impairing the Obligation of Contracts."

     The Contract Clause is not applied literally to prohibit

any legislative action that impairs government or private

15

contracts.  U.S. Trust Co. of N.Y. v. New Jersey, 431 U.S. 1, 21 (1977).  Rather, there exists a well-established analysis for determining whether a legislative action implicates and violates the Contract Clause.  See Fraternal Order of Police Lodge No. 89 v. Prince George's Cnty., 608 F.3d 183, 188 (4th Cir. 2010). This analysis balances and harmonizes the protections of the Contract Clause with the states' reserved police powers "to provide for the welfare of their citizens." Balt. Teachers Union v. Mayor & City Council, 6 F.3d 1012, 1015 (4th Cir. 1993) (citing U.S. Trust Co., 431 U.S. at 21).

Accordingly, in order to implicate the protection of the Contract Clause, one must establish that (1) a contractual obligation exists, (2) the legislative action retroactively impairs the contractual obligation, and (3) such impairment is substantial.  Id.  Even if there has been substantial retroactive impairment of a contractual obligation, the legislative action will, nevertheless, be permissible if it is reasonable and necessary to serve an important public purpose. Fraternal Order of Police, 608 F.3d at 188.

IV.   <u>DISCUSSION</u>

The Supreme Court has stated:

> As with laws impairing the obligations of
> private contracts, an impairment may be
> constitutional if it is reasonable and
> necessary to serve an important public
> purpose.

<u>U.S. Trust Co.</u>, 431 U.S. at 25.

Thus, the issue presented for decision is whether the City's impairment of Plaintiffs' contract rights by the Ordinance was "reasonable and necessary to serve an important public purpose."

A.   <u>Burden of Proof</u>

The parties debate whether the Plaintiffs or the City must bear the burden of proof with regard to the "reasonable and necessary" issue.

The United States Court of Appeals for the Fourth Circuit, while not definitively resolving the question, stated in 2007:

> In short, then, <u>a claimant must show</u> (1)
> contractual impairment, (2) that is
> substantial, and (3) not a legitimate
> exercise of state power. <u>See</u> <u>City of</u>
> <u>Charleston v. Pub. Serv. Comm's of W. Va.</u>,
> 57 F.3d 385, 391 (4th Cir. 1995) ("Only if
> there is a contract, which has been
> substantially impaired, and there is no
> legitimate public purpose justifying the
> impairment, is there a violation of the
> Contract Clause."). (Emphasis added)

<u>Catawba Indian Tribe v. City of Rock Hill</u>, 501 F.3d 368, 371

(4th Cir. 2007).

However, in 2009, this Court, by Judge Williams, stated:

> As a preliminary matter, it is undisputed
> that despite the Contract Clause, States
> retain a certain amount of power to
> safeguard the welfare of their citizens. To
> pass constitutional muster, however, a
> State, or as in the present case, <u>a County</u>,
> when exercising this power, by enacting
> legislation that constitutes a substantial
> impairment of its own contracts, <u>must
> demonstrate that the legislation is
> "reasonable and necessary to serve an
> important public purpose."</u> <u>Id.</u> at 25, 97 S.
> Ct. 1505.  (Emphasis added)

<u>Fraternal Order of Police</u>, 645 F. Supp. 2d at 508 (citing <u>U.S.</u>

<u>Trust Co.</u>, 431 U.S. at 25).

Last year, the United States Court of Appeals for the First

Circuit[14] placed the burden of proof on the party claiming that

the impairment was not "reasonable and necessary to serve an

important public purpose."  <u>United Auto., Aerospace, Agric.</u>

<u>Implement Workers of America Int'l Union v. Fortuno</u>, 633 F.3d

37, 45-47 (1st Cir. 2011).  However, the <u>Fortuno</u> court addressed

the matter in the initial pleading context, holding that

generalized allegations of illegitimate purpose and the

existence of other alternatives are insufficient to allege a

plausible claim that challenged legislation was not reasonable

---

[14]   Stating that it was the first court to analyze the issue in
detail.

and necessary to serve an important public purpose.  In sum, the Court finds the burden of proof issue unresolved, at least for courts outside the First Circuit.

In any event, the Court will assume that Plaintiffs have the burden of proving that the impairment of their contract rights by the Ordinance was not "reasonable and necessary to serve an important public purpose."  As discussed herein, Plaintiffs have carried that burden, if they had it.[15]


B.   Important Public Purpose

In determining whether a contractual impairment is aimed at an important public purpose, courts look to see whether there is a "significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social

---

[15]   If required to predict the burden of proof allocation that would be adopted by the appellate courts, the Court would find a useful analogy in the McDonnell Douglas burden of proof scheme. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Therefore, consistent with the First Circuit decision in Fortuno, the Court would impose a threshold burden on a plaintiff to plead (and ultimately to prove) facts sufficient to create a prima facie case that an impairment was not reasonable and necessary to serve an important public purpose.  If the plaintiff met this threshold burden, the burden would shift to the governmental unit to plead (and ultimately, to provide evidence to support) the position that the impairment was "reasonable and necessary to serve an important public purpose." Then, the ultimate burden would be on the plaintiff to disprove the government unit's asserted basis for contending that the impairment was "reasonable and necessary to serve an important public purpose."

or economic problem." Energy Reserves Grp., Inc. v. Kan. Power & Light Co., 459 U.S. 400, 411-12 (1983) (citations omitted). "[T]he public purpose need not be addressed to an emergency or temporary situation. . . . The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." Id. at 412. Ensuring the financial integrity of a city is a significant public purpose. Balt. Teachers Union, 6 F.3d at 1019. Increasing "the actuarial soundness of a pension system" is also an important public purpose. Md. State Teachers Ass'n v. Hughes, 594 F. Supp. 1353, 1368 (D. Md. 1984).

In the instant case, the restoration of actuarial soundness and sustainability to the Plan served an important public purpose, see Hughes, 594 F. Supp. at 1368, while ensuring the financial integrity of the City, see Balt. Teachers Union, 6 F.3d at 1019. At the time of the Ordinance's passage, it had become clear that the Plan's statutory post-retirement investment return assumption, which applied to the funds from which the Variable Benefit was calculated, was not a realistic reflection of the investment environment, in light of the fact the Variable Benefit skimmed off most earnings above 7.5% in any good year. Adjusting this rate from 6.8% to 5% required a dramatic and unaffordable increase of $64 million to the City's planned annual contribution to the Plan.

It is true that the "illogic" of the Variable Benefit structure that allowed for "short-term windfalls to member benefits with no real connection to inflation," PFM Report at 52, was not unforeseen by the legislature when it initially adopted the Variable Benefit.  In 1983, upon signing the legislation, then-Mayor William Donald Schaefer wrote:

> I am very concerned with the cost that will
> be shifted to the City taxpayer . . . . It
> is unreasonable and wishful thinking to
> believe that large sums of money can be set
> aside for the variable benefit, without
> increasing the cost of the pension system to
> the City.
>
> [O]ne of the more harmful provisions of the
> ordinances requires that the funds allocated
> for the variable benefit be segregated from
> the rest of the assets of the retirement
> system and provides that investment earnings
> on the variable benefit fund, in excess of
> 6%, inure only to the benefit of the
> variable benefit fund. . . . Therefore,
> through the years, depending on the
> investment performance and the aggregate of
> the assets, the City will not get the
> benefit of good investment years but will
> incur the cost of bad years. . . .
>
> However, despite all of the above concerns,
> I am aware of the plight of many of our
> retirees, and I am concerned for their well-
> being.  Therefore, despite the cost and the
> burdens those bills will place on future
> budgets, I am signing both bills to give our
> many retirees a much needed increase.

Letter from William Donald Schaefer to City Council, May 31, 1983 (appended to GBC Report).

Prior to passage of the 1983 legislation, the Plan
actuaries also expressed concern about the actuarial soundness
of the Variable Benefit provisions:

> The use of the word "Variable" can be
> misleading, however, because the benefit is
> only variable upwards.  Poor investment
> results would not affect increases already
> given and the City would be required to make
> up any shortfall over time. . . . This
> Variable Benefit concept is not a dominant
> technique and in fact lacks a history of
> success because it has not been widely used.

Letter from J. Delaney and T. Lowman to Plan Board, Mar. 8, 1983
(appended to GBC Report).

However, at least one unforeseen consequence of the
workings of the Variable Benefit feature became apparent in
early 2010.  At that time, the Pension Accumulation Fund had a
negative balance because of market losses, and an application of
the statutory formula[16] would have required the City to allocate
more than 100 percent of the investment gains to fund the
Variable Benefit, an absurd result.  See Trial Tr. Feb. 2, 2012
at 208-10; City's Post-Trial Br. [Document 155] 26-27.

Ultimately, the structure of the Variable Benefit feature,
coupled with the fact that the statutory post-retirement
investment return assumption of the Plan needed to be reduced

---

[16]    All gains between 7.5 and 10 percent and half of the gains
above 10 percent were multiplied by the ratio of the retirees'
assets to the sum of the retirees' and active members' assets.

from 6.8% to 5% to regain actuarial soundness, led to the
unintended consequence of destabilizing the Plan.

The fact that the risk of destabilization could have been,
perhaps should have been, unforeseen does not preclude the
conclusion that stabilization was an important public purpose.
See Hughes, 594 F. Supp. at 1368.

In sum, the Court finds that an important public purpose
would be served by an impairment of Plaintiffs' contract rights
under the Plan, and would be Constitutionally permissible if the
impairment was "reasonable and necessary."

Accordingly, the question presented is whether the
legislation at issue, the Ordinance which included the
elimination of the Variable Benefit feature and the substitution
of the Tiered COLA, was "reasonable and necessary."  See Energy
Reserves Grp., 459 U.S. at 412; Balt. Teachers Union, 6 F.3d at
1019.


        C.   Reasonable and Necessary

There was an important public purpose to be served by the
restructuring of the Plan so as to restore it to actuarial
soundness and sustainability.  Hence, the City's impairment of
Plaintiffs contract rights, including their rights to the
Variable Benefit feature, could be Constitutionally valid if
"reasonable and necessary."  However, the City did not have

total freedom to disregard its contractual obligations altogether.

The Plan provided all beneficiaries with equal inflation protection by means of periodic benefit increases.  Thus, each beneficiary had a significant contractual right to increases resulting from the Variable Benefit feature.  The City, by means of the Ordinance and its Tiered COLA system, chose to impair the contact rights of some beneficiaries far more than others.

In Baltimore Teachers Union v. Mayor & City Council of Baltimore, the Fourth Circuit held that courts must accord "at least some deference to legislative policy decisions to modify" public contracts.[17]  6 F.3d 1012, 1019 (4th Cir. 1993).  However, the impairment of public contracts "must be more scrupulously examined" than the impairment of private contracts, because

---

[17]    Further, the Court cautioned:

> The Contract Clause, however, does not
> require the courts—even where public
> contracts have been impaired—to sit as
> superlegislatures, determining, for example,
> whether it would have been more appropriate
> instead for Baltimore to close its schools
> for a week, an option actually considered
> but rejected, or to reduce funding to the
> arts, as appellees argue should have been
> done.  Not only are we ill-equipped even to
> consider the evidence that would be relevant
> to such conflicting policy alternatives; we
> have no objective standards against which to
> assess the merit of the multitude of
> alternatives.

Balt. Teachers Union, 6 F.3d at 1021-22.

"'the State's self-interest is at stake.'"  Id. (citing Allied
Structural Steel Co. v. Spannaus, 438 U.S. 234, 244 & n. 15
(1978); quoting U.S. Trust Co. v. New Jersey, 431 U.S. 1, 26
(1977)).

In U.S. Trust Co., the Supreme Court instructed that
impairment of a prior contractual right is "reasonable" where
the contract "had effects that were unforeseen and unintended by
the legislature when originally adopted."  431 U.S. at 31; see
also Md. State Teachers Ass'n v. Hughes, 594 F. Supp. 1353, 1362
(D. Md. 1984).  "Necessity is to be judged on two levels: 1)
whether a less drastic modification could have been implemented;
and 2) whether, even without modification, the State could have
achieved its stated goals."  Hughes, 594 F. Supp. at 1362
(citing U.S. Trust Co., 431 U.S. at 29-30).

The Fourth Circuit has further addressed the appropriate
inquiry:

> It is not enough to reason, as did the
> district court, that "[t]he City could have
> shifted the burden from another governmental
> program," or that "it could have raised
> taxes." . . .  Were these the proper
> criteria, no impairment of a governmental
> contract could ever survive constitutional
> scrutiny, for these courses are always open,
> no matter how unwise they may be.  Our task
> is rather to ensure through the "necessity
> and reasonableness" inquiry that states
> neither "consider impairing the obligations
> of [their] own contracts on a par with other
> policy alternatives" or "impose a drastic
> impairment when an evident and more moderate

> course would serve its purposes equally
> well," United States Trust, 431 U.S. at 30-
> 31, nor act unreasonably "in light of the
> surrounding circumstances," id. at 31.

Balt. Teachers Union, 6 F.3d at 1019-20 (emphasis in original)

(some citations omitted).

In Baltimore Teachers Union, the City had implemented a

furlough plan under which it reduced the annual salaries of its

employees by .95% through deductions from five of their semi-

monthly paychecks.  Id. at 1014.  The Fourth Circuit concluded

that it was "satisfied" by Baltimore City's actions:

> Required by law to balance its budget, the
> City took what we believe to be needed and
> measured steps to absorb extraordinary
> reductions in revenue. . . . the City did
> not consider salary reductions on a par with
> other policy choices. . . .  Nor on such
> facts as these can we conclude that the City
> chose a drastic impairment over an equally
> acceptable, more moderate course. . . .
> Finally, the plan did not alter pay-
> dependent benefits, overtime pay, hourly
> rates of pay, or the orientation of pay
> scales.  See United States Trust, 431 U.S.
> at 27 ("The extent of impairment is
> certainly a relevant factor in determining
> its reasonableness.").  In short, the City
> clearly sought to tailor the plan as
> narrowly as possible to meet its unforeseen
> shortfalls.

Id. at 1020-21.

The Baltimore Teachers Union court also noted that "the

salary reductions were reasonable under the circumstances," in

part because "Baltimore's plan did not narrowly target specific

26

classes of employees; it extended to all City employees." Id.
at 1021.  In sum, "Baltimore's plan was, as it must be, 'upon
reasonable conditions and of a character appropriate to the
public purpose justifying its adoption.'" Id. (citing U.S.
Trust Co., 431 U.S. at 22).

This Court, in Hughes, considered Maryland's 1984 "Pension
Reform Act," which replaced a 1979 pension program that included
an unlimited COLA tied to inflation with four options, one that
retained unlimited COLA increases in exchange for additional
salary contributions.  See 594 F. Supp. at 1368.  Judge Miller
found that the contractual impairment was reasonable and
necessary because "the impairment to State employees or
teachers" was "minimal at worst," and corrected the unforeseen
and unintended effects of the 1979 plan – largely, that
"unpredictably high levels of inflation" prevented the 1979 plan
from financially stabilizing the pension system, as intended.
Id. at 1370-71.

While the City was justified in acting to stabilize the
actuarial footing of the Plan, the Ordinance scheme was not
"necessary," in the sense that the impairment far more
drastically impaired the contractual rights of some Plan members
than others while a perfectly evident, more moderate and even-

handed course would have served its purposes equally well.[18]  See
U.S. Trust Co., 431 U.S. at 30-31, Balt. Teachers Union, 6 F.3d
at 1019-20; Hughes, 594 F. Supp. at 1362.

As this Court stated in the Second Trial Decision:

> The Ordinance's age-based COLA will
> drastically impact a significant number of
> members of the Entitled Group.  For example,
> of the approximately 6,000 members of the
> Entitled Group, over 1,000 will have to wait
> from 1 to 10 years to obtain a 1% COLA and
> then will wait an additional 10 years to
> obtain a 2% COLA.  Indeed, 138 will have to
> wait at least 15 years to get a 1% COLA and
> at least a total of 25 years to get a 2%
> COLA.

Second Trial Decision 34-35 (footnotes omitted).

The Court does not find that the total elimination of the
Variable Benefit, which provided an average of a 3% annual

---

[18]    It is worth noting that the impairment was also drastic for
the reason that the Variable Benefit increase for the year
ending June 31, 2010, would have been between 3.75% and 4.5%.
In the Second Trial Decision, the Court found that:

> The parties' expert witnesses agree that if
> Ordinance 10-306 had not been enacted, there
> would have been a Variable Benefit increase
> for the fiscal year preceding the effective
> date of Ordinance 10-306.  Plaintiffs'
> expert witness opined that the Variable
> Benefit increase for that year would have
> been between 3.75% and 4.5%.  While the
> precise amount may be subject to debate,
> there is no doubt that the Ordinance caused
> the loss of a significant, and permanent,
> increase in the benefits paid to most
> members of the Entitled Group.

Second Trial Decision 35-36 (footnotes omitted).

benefit increase for more than a decade for many members, is a
"minimal" impairment, see Hughes, 594 F. Supp. at 1368, or on
par with a one-time, .95% salary reduction, see Balt. Teachers
Union, 6 F.3d at 1014.

The City contends that it adopted the Tiered COLA intending
to utilize limited funds to provide the greatest benefit to the
"retirees and beneficiaries who were 65 years of age and older
and who were likely to depend principally on their pension for
their income."  See Trial Tr. Feb. 2, 2012 at 110-11.  Even if
this were true, it is not true that the elimination of the
Variable Benefit feature and the substitution of the Tiered COLA
had that effect.  Rather, the Tiered COLA had the pernicious
effect of eliminating and/or reducing annual increases from
retirees under 65 at the time of enactment and, consequently,
significantly reducing their pensions when they became 65, the
age at which they "were likely to depend principally on their
pension for their income."  In effect, the choice to use the
Tiered COLA instead of an equally applied COLA of something less
than 2%, takes substantially from beneficiaries under 65 years
of age on the effective date of the Ordinance to give more to
beneficiaries who were age 65 or more at that time.

Consider, for example, a police officer who retires at age 45 with a pension of $20,000 per year. Under the Tiered COLA system his pension would be $20,000 at age 55 (after ten years at 0%) and approximately $22,000 at age 65 (after 10 years at 1%). In comparison, an equally applicable COLA at a rate below 2%, indeed, even as low as 1%, would still yield this retiree a pension at age 65 thousands of dollars higher than would the Tiered COLA. Moreover, due to the compounding effect, the thousands of dollars Tiered COLA "deficit" in the retiree's pension at age 65 will not only reduce his/her income at the asserted time of greatest need, but also tend to perpetuate the shortfall.

The Court is mindful that its role is not to "sit as [a] superlegislature[], determining, for example, whether it would have been more appropriate instead for Baltimore to close its schools for a week . . . or to reduce funding to the arts." Balt. Teachers Union, 6 F.3d at 1021-22. The Court is satisfied that it was reasonable for the City to enact legislation to stabilize the Plan by impairing the Variable Benefit. The Court defers to the legislature's decision to impair its contract with Plaintiffs rather than shift the burden to other government programs or raise taxes. See id. at 1019-20.

However, in enacting the Ordinance, the City "impose[d] a drastic impairment when an evident and more moderate course

30

would [have] serve[d] its purposes equally well." U.S. Trust
Co., 431 U.S. at 30–31.

The Tiered COLA "narrowly target[s] [a] specific class[] of
employees," Balt. Teachers Union, 6 F.3d at 1021, by drastically
reducing the annual post-retirement benefit increases of all
younger beneficiaries from an average of 3% to either 0% or 1%
on an ongoing basis, and in such a way that essentially
guarantees that inflation will significantly erode the younger
retirees' retirement benefit by the time they reach the age of
65.

The City did not need to adopt a Tiered COLA that treats
Plan beneficiaries differently according to their age and thus
impairs the contract rights of some far more severely than
others.

The City may well have been able to, indeed should have
been able to, enact an Ordinance that accomplished the desired
important public purpose without the unnecessarily
discriminatory effect of the Tiered COLA.  For example, it could
have provided an annual COLA for all beneficiaries, albeit at a
rate less than 2%.

The Unions proposed a 2% COLA for all Plan beneficiaries.
See GBC Report at 18; Union Proposal at 6; Tr. City Council June
21, 2010 at 7.  Plaintiffs have not proven that a 2% COLA would
adequately serve the important public purpose of restoring

31

actuarial soundness to the Plan, while "tailor[ing] the plan as narrowly as possible to meet its unforeseen shortfalls." Balt. Teachers Union, 6 F.3d at 1021.   However, there has been testimony by the Unions' actuary that, at one time, prior to the market losses of 2008-2009, "the Plan actuary at some point had given indications that a 1.88% COLA would be cost neutral."  Tr. City Council June 10, 2010 at 63, 110; see also Trial Tr. Feb. 2, 2012 at 221-23.  The Court has also heard testimony that the City could have provided a 1.5% COLA with an added "kicker," similar to the post-retirement provisions of the City's Employee Retirement System.  See Trial Tr. Feb. 2, 2012 at 107, 193-94.

The Court cannot rewrite the Ordinance and does not suggest that an equally-applied annual COLA would be the only contract impairment that would be "reasonable and necessary."  However, in 2010, the City Council only considered the Tiered COLA and the Unions' 2% COLA proposals – it did not seek to modify the Unions' proposal in a way that would provide a COLA that applied equally to all beneficiaries, that was tailored as narrowly as possible to meet the funding shortfalls, and that would restore actuarial soundness to the plan, as it should have.  See Balt. Teachers Union, 6 F.3d at 1020-21.

Accordingly, the Court finds that the Ordinance, by virtue of the elimination of the Variable Benefit feature and the

"substitution" of the Tiered COLA,[19] was not reasonable and necessary to serve an important public purpose.


V.    CONCLUSION

For the reasons set forth herein, the Court finds that the Ordinance is an unconstitutional impairment of the rights of members of the Entitled and Eligible Groups to the Variable Benefit feature.

SO DECIDED, this Thursday, September 20, 2012.


                              _____/s/_____
                                   Marvin J. Garbis
                              United States District Judge

---

[19]    There are aspects of the Ordinance that the Court would – if it could - find reasonable and necessary.  For example, the substitution of the City's credit for the funds set aside for payment of Variable Benefit increases appears, on its own, to be reasonable and necessary.  However, the parties have emphasized that the Court must treat the Ordinance as unseverable.